Kyle S. Hirsch, Esq. (#024155)
Rachel E. Phillips, Esq. (#029630)
**BRYAN CAVE LLP**
Two N. Central Avenue, Suite 2100
Phoenix, AZ  85004-4406
Telephone:  (602) 364-7000
Facsimile:  (602) 364-7070
Email: kyle.hirsch@bryancave.com
       rachel.phillips@bryancave.com

Attorneys for UMB Bank, n.a.

**IN THE UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Case No. 2:17-bk-00594-BMW |
| GREEN FUEL TECHNOLOGIES, L.L.C. | Chapter 11 |
| Debtor. | **PRELIMINARY OBJECTION TO CONFIRMATION OF PLAN OF REORGANIZATION**<br><br>**Hearing Date:  June 21, 2017**<br>**Hearing Time:  1:30 p.m.** |

Secured Creditor UMB Bank, n.a. ("UMB"), by and through undersigned counsel, hereby objects[1] to confirmation of the plan of reorganization [DE ##103, 130 Ex. A] ("Plan") proposed by the above-captioned debtor ("Debtor").  The Plan suffers many incurable flaws, including but not limited to the lack of feasibility as demonstrated by the Debtor's pre-petition and postpetition performance that has depleted all of the Debtor's cash.  The Court should deny confirmation of the Plan, and grant such other and further relief as necessary to prevent further and irreversible deterioration of the estate.

This Objection is more fully supported by the following Memorandum of Points and Authorities and the entire record before the Court in this Chapter 11 case.

///

///

---

[1] UMB reserves the right to supplement this preliminary objection in connection with contested plan confirmation proceedings.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. BACKGROUND.

1. On January 20, 2017 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. ("Bankruptcy Code").

2. The Debtor continues to operate its business as a debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code.

3. This Court has jurisdiction over the Debtor's bankruptcy case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

### A. The Debtor's Indebtedness To UMB.

4. The Debtor owes UMB no less than $729,379.77 pursuant to a prepetition matured line of credit loan (as the same has been modified from time to time, "Loan") evidenced by, among other things, and promissory note with an 8-month maturity. The Loan is secured by properly perfected liens in virtually all of the Debtor's personal property assets, including the Debtor's cash, accounts receivable, inventory, and equipment ("Collateral"). *See* DE #20, Exs. A-B; Proof of Claim No. 2.

5. The Debtor admits that it owes UMB $701,000. *See* DE #38, at 8 ¶ 2.2. Throughout these proceedings, the Debtor has asserted that the Collateral value far exceeds UMB's indebtedness.

6. UMB commenced a state court lawsuit on January 10, 2017, against the Debtor and its principals, seeking (among other things) recovery of the outstanding balance of the Loan, enforcement of the principals' guaranties, and the appointment of a receiver. The Debtor filed this case less than one hour before the return evidentiary hearing on the receivership application. The Debtor's principals have filed a motion to dismiss arguing that a suit on the guaranties is not ripe because the Debtor is seeking to confirm the Plan.

///

///

7. On February 13, 2017, UMB filed a motion to convert this case to Chapter 7 or, in the alternative, to dismiss this case [DE #43] ("Dismissal Motion"), arguing that the Debtor's business cannot be effectively reorganized. The Dismissal Motion remains pending.[2]

**B.    The Debtor's Declining Performance And Dwindling Assets.**

8. In less than two months prepetition, between November 30, 2016, and the Petition Date, the Debtor's <u>total</u> accounts receivable declined by nearly $700,000 - down from nearly $1.1 million to just over $400,000. *See* DE #38, Exs. C-D.

9. Despite collecting receivables of nearly $700,000 in approximately 45 days prepetition, the Debtor asserted a Petition Date cash balance of $230,000 - reflecting no less than $450,000 of cash depletion. *See* DE #38, at 1 ¶ 5.

10. Since the Petition Date, the Debtor's business operations have continued to suffer greatly.

11. The Court authorized the Debtor to pay approximately $140,000 in pre-petition claims of certain trade creditors labeled by the Debtor as "critical vendors," conditioned on the Debtor maintaining its cash balance - thus requiring the Debtor to generate approximately $140,000 in net cash to make these payments. [DE #121] To date, after approximately two months, the Debtor has been unable to meet this condition, and the "critical vendors" remain unpaid.

12. In fact, over UMB's objections, the Debtor has depleted its entire Petition Date cash balance of approximately $230,000. According to the Debtor's own budget variance report, the Debtor had under $2,000 of cash on hand as of June 9, 2017.[3]

13. The Debtor's cash has essentially evaporated postpetition, even though the Debtor's principals have (i) used personal funds to pay $30,000 to certain estate creditors, and (ii)

---

[2] Upon denial of confirmation, UMB intends to ask the Court to grant the Dismissal Motion.

[3] During the week ending June 9, the Debtor received a cashier's check deposit of $23,000 which enabled the Debtor to cover payroll. It is unclear whether the cashier's check constitutes funds from operating revenue or an additional contribution from the Debtor's principals, and UMB reserves all of its rights. However, the Debtor's cash situation threatens the Debtor's ability to assure checks written out of the DIP Account - regardless of amount - can be negotiated when presented, and strongly suggest administrative insolvency.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

used personal credit cards to pay at least $90,000 of alleged business expenses for which the estate has reimbursed less than $35,000. The Debtor has not requested or obtained Court authorization or lender consent for any of these transactions.[4]

14. The Debtor's total accounts receivable has increased slightly since the Petition Date, but the Debtor continues to suffer from poor collections. As of the Petition Date, nearly 65% of the Debtor's accounts receivable ($261,093) was highly collectible in the 0-60 day aged category, and only 35% was older than 60 days. As of June 12, that ratio has flipped. Accounts receivable under 60 days old has fallen to half the Petition Date value ($132,340.35) and less than 30% of total accounts receivable:

| Age | 1/23/17 | **Percentage of Total** | 6/12/17 | **Percentage of Total** |
|---|---|---|---|---|
| 0-30 days | $61,214.42 | **15%** | $125,108.37 | **27%** |
| 0-60 days | $199,879.41 | **49%** | $7,231.98 | **1.5%** |
| 61-90 | $130.00 | **>1%** | $37,220.85 | **8%** |
| 90+ | $143,297.80 | **35%** | $290,681.71 | **62%** |
| **TOTAL** | **$404,521.63** | | **$460,242.91** | |

C. **Debtor's Compliance Deficiencies.**

15. As set forth in UMB's *First Supplement To Motion To Dismiss Or Convert For Cause* [DE #142] ("Dismissal Motion Supplement"), which is incorporated by this express reference, the Debtor has failed to timely file its monthly operating reports and to comply with controlling cash collateral orders. This behavior continues to occur: The Debtor failed to timely pay UMB's adequate protection payment when due on June 1, and failed to produce its weekly accounts receivable report and budget variance report when due on June 12.

///

---

[4] UMB reserves all of its rights with respect to unauthorized postpetition financing transactions.

16. The Debtor has failed to explain the unauthorized or undisclosed payments outlined in the Dismissal Motion Supplement, and has failed to disclose any credit card statements allegedly supporting nearly $10,000 of estate funds paid to principal Kelly Casey's Citicard account.

17. Despite multiple requests, the Debtor has failed to disclose its most recent detailed inventory report.

### D. The Disclosure Statement And Plan.

18. On April 11, 2017, the Debtor filed a disclosure statement [DE #102] to accompany the Plan. On May 19, 2017, the Debtor filed its Second Amended Disclosure Statement [DE #130], which the Court approved by order entered on May 22, 2017 [DE #134].

## II. THE PLAN IS UNCONFIRMABLE.

The Debtor, as plan proponent, bears the burden of proving that the Plan satisfies the confirmation requirements. *See In re Perez*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994). The confirmation requirements are set forth at 11 U.S.C. § 1129, and authorize the Court to confirm a plan only if the Debtor satisfies all of the requirements contained in sections 1129(a)(1) through (13). 11 U.S.C. § 1129(a). If the Debtor satisfies all of the requirements other than section 1129(a)(8) (i.e., that each impaired class has accepted the plan), the Debtor must meet the rigorous requirements of "cramdown" under section 1129(b) to confirm its Plan over a dissenting creditor's objection. 11 U.S.C. § 1129(b)(1). A cramdown plan may only be confirmed upon a showing that the plan does not discriminate unfairly and is fair and equitable with respect to the dissenting class of creditors. *Id.*

The Debtor cannot sustain its burden of proving that the Plan satisfies section 1129, warranting denial of Plan confirmation.

### A. The Plan Fails To Meet The Confirmation Requirements Of Section 1129(a).

#### 1. Section 1129(a)(1)—the Plan Fails to Comply with Applicable Provisions of the Bankruptcy Code.

Pursuant to section 1129(a)(1), a plan cannot be confirmed unless it complies with all applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1); *In re Lowenschuss*, 67

F.3d 1394, 1401 (9th Cir. 1995) ("The bankruptcy court lacks the power to confirm plans of reorganization which do not comply with applicable provisions of the Bankruptcy Code."). Although many courts have focused on compliance with sections 1122 and 1123 of the Bankruptcy Code in connection with this confirmation requirement, a plan's failure to comply with any chapter 11 requirement will doom confirmation. *See In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (holding that a plan must comply with all the requirements of chapter 11, even absent objections to confirmation).

In this case, the Plan fails to comply with multiple sections of the Bankruptcy Code.

The Plan violates section 506(b). The Debtor has repeatedly admitted that substantial equity exists in the Collateral, rendering UMB an oversecured creditor who "shall be allowed . . . interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose." 11 U.S.C. § 506(b). An oversecured creditor's entitlement to post-petition interest includes default interest. *See Gen. Elec. Capital Corp. v. Future Media Prods., Inc.*, 547 F.3d 956 (9th Cir. 2008). The Plan unlawfully prohibits any payment of default interest or late charges. *See* Plan, at 13 § VI.10.

The Plan also violates section 362. The automatic stay applies to estate property only as long as such property remains estate property. 11 U.S.C. § 362(c)(1). Upon confirmation, all property of the estate vests in the Debtor. *See* Plan, at 9 § V.B. Notwithstanding, the Plan continues to impose a stay "against the Debtor or its assets." *See id.*, at 11 § V.F. The Plan therefore imposes the automatic stay in direct conflict with the express language of the Bankruptcy Code.

**2. <u>Section 1129(a)(2)—the Plan Proponent Has Failed to Comply with Applicable Provisions of the Bankruptcy Code.</u>**

Pursuant to section 1129(a)(2), a plan cannot be confirmed unless the plan proponent complies with the applicable provisions of the Bankruptcy Code. The Debtor is debtor-in-possession, and is responsible for performing various duties as a fiduciary to creditors under the Bankruptcy Code. 11 U.S.C. § 1107(a)(1). The Debtor must, among other things, file periodic reports as the United States Trustee or the Court requires. 11 U.S.C. §§ 1106(a)(1), 704(a)(8).

6

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

The Debtor must also "furnish such information concerning the estate and the estate's administration as is requested by a party in interest." *Id*. §§ 1106(a)(1), 704(a)(7). The Debtor has consistently failed to comply with these requirements.

The Debtor consistently failed to timely submit reports, not only as required under the controlling cash collateral orders but also as required by the US Trustee's Office guidelines. The Debtor has also refused to provide UMB with a detailed report of its inventory despite multiple requests made through counsel. By withholding information, the Debtor is not allowing parties or the Court full access to necessary information to evaluate whether to confirm the Plan. This also implicates a lack of good faith, as discussed below.

The Debtor has failed to timely pay adequate protection payments due to UMB under applicable cash collateral orders, thereby violating express Court orders conditioning the use of cash collateral. *See* 11 U.S.C. § 363(c)(2) (requiring lender consent or a court order to use cash collateral).

The Debtor has improperly obtained financing from its principals without Court approval. 11 U.S.C. § 364(b) (requiring a court order, after notice and a hearing, before the trustee may obtain unsecured credit or incur unsecured debt other than that incurred in the ordinary course of business).

### 3. Section 1129(a)(3)—the Plan Has Not Been Proposed in Good Faith.

Section 1129(a)(3) requires that the plan be proposed "in good faith and not by any means forbidden by law." Although good faith is not defined by the Code, "[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." *In re Sylmar Plaza*, *L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002). The requisite good faith determination is based on the totality of the circumstances. *In re Stolrow's, Inc.*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988). Examples of a lack of good faith on the debtor's part may be found when the debtor files to avoid or delay ongoing state court litigation; when the debtor is using bankruptcy to protect non-debtor third parties, particularly insiders; or when the debtor uses bankruptcy to gain an upper hand against a rival. *See In re Trans Max Technologies, Inc*., 349 B.R. 80, 85 (Bankr. D. Nev. 2006).

In this case, the Debtor plainly filed this case to prevent the appointment of a receiver and thwart UMB's collection efforts in state court. Indeed, the Debtor's principals are using the Plan in an attempt to deter liability on their separate contractual guaranty liability.[5] Further, the Plan seeks to "term out" UMB's claim over a 5-year term, paying a virtually risk-free rate of interest, and stripping UMB of standard lender protections including but not limited to collateral inspections, acceleration upon default, and accrual of default interest. This Debtor, which has been and remains unable to support its operations based solely on operating revenue, is using chapter 11 to take advantage of provisions that the Debtor could not obtain outside of bankruptcy to protect insiders and to gain an upper hand against a rival. *See Trans Max Technologies*, 349 B.R. at 85. The Debtor has remained delinquent on reporting requirements, has refused to disclose a detailed report of inventory, and has disguised and refused to explain its use of UMB's cash collateral. That is not good faith.

Indeed, the Plan espouses an "insiders first" approach by giving equity and insider management unfettered rights to any upside in the Debtor's performance (however unlikely) without regard to repaying estate creditors. Thus, for example, equity holders could potentially take monthly distributions of any excess operating income, which would then deprive creditors in the event of subsequent underperformance.

**4.      Section 1129(a)(7)—the Plan Fails to Meet the Best Interests Test.**

Section 1129(a)(7), also referred to as the "best interests of creditors" test, requires that each holder of a claim or interest in each impaired class must accept the plan, or receive value as of the plan's effective date that is not less than the amount such holder would receive under a chapter 7 liquidation. *See, e.g.*, *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 679 (D. Ariz. 1994). As discussed below, the Plan's proposed interest rate fails to compensate UMB for the time value of money and the significant risks associated with the proposed claim treatment, which features a 60-month term at a 5% interest rate; monthly payments that are not clearly defined as interest, principal, or a combination of both; and no postpetition default interest or late

---

[5]      UMB reserves all of its rights against the principals on their guaranties.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

charges as required under section 506(b). In a chapter 7 case (based on the Debtor's asserted valuation of the Collateral), UMB would promptly recover in full, with all interest and fees pursuant to section 506(b). Accordingly, UMB receives less under the Plan than it would in a chapter 7 case.

### 5. **Section 1129(a)(8) - UMB's Rejection Vote.**

UMB has voted to reject the Plan on account of its Class 4 claim, which is impaired under the Plan - thus defeating Debtor's ability to satisfy section 1129(a)(8).

### 6. **Section 1129(a)(11)—the Plan Is Not Feasible.**

Section 1129(a)(11) of the Bankruptcy Code requires that a plan be "feasible"—*i.e.*, that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor . . . ." 11 U.S.C. § 1129(a)(11). Feasibility requires a determination of whether the debtor can perform under the plan as a practical matter under the facts. *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). A plan is feasible if the debtor demonstrates by a preponderance of the evidence that the plan has a reasonable probability of success. *In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir. 1986); *see also*, *Pizza of Hawaii,* 761 F.2d at 1382; *In re Trans Max Techs., Inc.*, 349 B.R. 80, 90 (Bankr. D. Nev. 2006) (debtor bears the burden of proof that the plan, more probably than not, meets the confirmation standards). The debtor must "show concrete evidence of a sufficient cash flow to fund and maintain" its plan obligations. *In re Las Vegas Monorail Co.*, 462 B.R. 795, 800 (Bankr. D. Nev. 2011) (quoting *S&P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995)). A debtor is required to prove feasibility in order to prevent "visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] at 1129–34 (15th ed. 1984)).

The Debtor cannot carry its burden of proving by a preponderance of the evidence that the Plan is feasible.

The Debtor has proven it cannot reliably project future performance. For example, and despite several updates, the Debtor has woefully underperformed against its cash collateral

9

814851.3\0547940
Case 2:17-bk-00594-BMW    Doc 152    Filed 06/14/17    Entered 06/14/17 13:49:27    Desc
Main Document    Page 9 of 14

budgets throughout this bankruptcy case. More acutely, actual performance matters. In the 45 days prepetition, the Debtor depleted approximately $450,000. Since the Petition Date, the Debtor's cash has evaporated from $230,000 to under $2,000 despite "borrowing" at least another $55,000 of unreimbursed loans from the Debtor's principals. Notwithstanding losing $735,000 in cash over 7 months, the projections supporting the Plan miraculously propose that the Debtor's July 1 cash position will be $118,419, a drastic two-week turnaround from its virtual $0 bank balance as of June 12; and net operating income of $250,000 over a three month period, which is unprecedented growth compared to the Debtor's recent operating history.

In addition, the projections anticipate confirmation of the Debtor's Plan as proposed, even though (as described more fully below) any confirmable plan must provide for a higher interest rate and shorter repayment term for UMB.

### B. The Plan Fails To Satisfy Section 1129(a)(8) And The "Cramdown" Requirements Of Section 1129(b).

Because the Debtor cannot satisfy section 1129(a)(8), the Debtor must meet the rigorous "cramdown" provisions under section 1129(b). The Plan fails to meet these requirements and, accordingly, cannot be confirmed.

#### 1. The Plan Fails to Provide UMB with a Provable Sufficient Lien, Proper "Deferred Cash Payments," or Indubitable Equivalent.

Section 1129(b)(2)(A) provides that a plan is not fair and equitable as to a non-consenting class of secured claims unless (i) the creditor retains its liens "to the extent of the allowed amount of such claims," and receives "deferred cash payments on account of such claim totaling at least the allowed amount of such claim as of the effective date of the plan of a value . . . of at least the value of such holder's interest in the estate's interest in such property;" (ii) the secured property is sold subject to the secured creditor's lien rights; or (iii) the secured creditor receives the "indubitable equivalent" of its claim. *See* 11 U.S.C. § 1129(b)(2)(A)(i). Although the sale provisions do not apply, the Plan fails the remaining tests.

The Debtor has maintained throughout the course of these proceedings that UMB is oversecured, and approximates that UMB's allowed secured claim is no less than $729,379.77

10

plus postpetition interest and attorneys' fees. *See* Plan, at 7. However, the Debtor has failed to disclose to UMB, despite multiple requests, a detailed inventory report from which to establish the value of inventory on which UMB's lien attaches. The Debtor thus cannot prove that UMB's liens secure the allowed amount of its claims. Additionally, the Debtor cannot prove that the deferred cash payments satisfy the cramdown requirements. The proposed 5% interest rate does not adequately compensate UMB with the present value of its secured claim, which requires a "time value of money" analysis. *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 377 (1988); *Till v. SCS Credit Corp.*, 541 U.S. 465, 477 (2004) (plurality opinion).

The Plan does not provide UMB with the "indubitable equivalent" of its claim, but rather proposes to pay UMB principal and insufficient interest over an unreasonably extended term, without even standard lender protections.

### 2. The Plan Fails the General "Fair and Equitable" Test.

In addition to satisfying section 1129(b)(2)(A), the "fair and equitable" test requires a plan proponent to show that the plan meets the "implicit" fairness standard under section 1129(b)(1). *See, e.g.*, *In re D & F Const., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989); *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 436 (C.D. Cal. 1993); *In re Prussia Assoc.*, 322 B.R. 572, 605 (Bankr. E.D. Pa. 2005); *In re Tri Growth Centre City, Ltd.*, 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992). The implicit fairness test focuses on broad notions of fairness and whether a plan unreasonably shifts risk to the party subject to cramdown. *See, e.g.*, *Monarch Beach*, 166 B.R. at 436; *see also* Jack Friedman, *What Courts Do to Secured Creditors in Chapter 11 Cram Down*, 14 Cardozo L. Rev. 1495 (1993).

The Plan treats UMB's claim unfairly and shifts all of the risk to UMB.

First, the Plan proposes to repay UMB over a five-year term, requiring UMB to sit on the sidelines for five years while the Debtor's insiders continue to retain all of the equity with full authority to draw any profits out of the Debtor without contributing a dime of new value. The Loan term only extended eight months. Allowing the Debtor a full five years to repay a short-

11

814851.3\0547940
Case 2:17-bk-00594-BMW    Doc 152    Filed 06/14/17    Entered 06/14/17 13:49:27    Desc
Main Document    Page 11 of 14

term debt obligation unfairly forces UMB to bear the full risk of the Debtor's historically poor business performance.

Second, the Plan proposes to repay UMB interest at the rate of 5% per annum. Based on the nature of UMB's collateral, the Debtor's history of weak performance, the proposed term of claim repayment and other risk factors, a 5% interest rate fails to compensate UMB for the risks associated with the proposed repayment.

Third, the Plan expressly rejects all aspects of the UMB Loan documents, which contain protections that are standard for lenders in commercial transactions. *See*, *In re P.J. Keating Co.*, 168 B.R. 464, 473 (Bankr. D. Mass. 1994) (stating that stripping of loan covenant was not fair and equitable); *In re Kellogg Square P'ship*, 160 B.R. 343, 368 (Bankr. D. Minn. 1993) ("In exchange for the forced entry into that loan, the creditor is entitled to demand both pecuniary and nonpecuniary terms that are sufficient to shelter it from the risks inherent in the Debtor's proposal."). Such protections include, but are not limited to, defining events of default; providing specific remedies in the event of default; defining timing of payments and consequences of late payments, including late charges; establishing reporting requirements; and affording collateral access and inspection rights. The Plan offers no lender protections.

Fourth, the Plan purportedly treats UMB as fully secured but refuses to pay UMB default interest and other amounts to which UMB is entitled as a fully secured creditor. *See, e.g.*, 11 U.S.C. § 506(b). Post-petition default interest is recoverable under section 506(b) where, as here, the Debtor has asserted that UMB is oversecured and the Plan provides for the retention of equity interests. *See Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527 (1941); *In re Dow Corning Corp.*, 456 F.3d 668, 678 (6th Cir. 2006); *In re SNTL Corp.*, 571 F.3d 826 (9th Cir. 2009). The Plan's attempt to deny UMB its right to recover post-petition default interest and other charges renders the Plan unfair and justifies denial of confirmation.

## III. **RESERVATION OF RIGHTS.**

UMB reserves the right to supplement this Objection as necessary and/or to present additional arguments and evidence at trial, even if not discussed herein.

## IV. CONCLUSION.

WHEREFORE, UMB respectfully requests that the Court enter an order:

    A.    Denying confirmation of the Plan; and

    B.    Granting UMB such other and further relief as the Court deems appropriate under the circumstances.

DATED this 14th day of June, 2017.

                      BRYAN CAVE LLP

                      By /s/ KSH, #024155
                          Kyle S. Hirsch
                          Rachel E. Phillips
                          Two N. Central Avenue, Suite 2100
                          Phoenix, AZ 85004-4406
                          Attorneys for UMB Bank, n.a.

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1  COPY served via email and/or US Mail
   this 14th day of June, 2017, upon:

2  Pernell W. McGuire, Esq.
   Preston Gardner, Esq.
3  Davis Miles McGuire Gardner, PLLC
   40 E. Rio Salado Parkway
4  Ste. 425
   Tempe, AZ  85281
5  pmcguire@davismiles.com
   pgardner@davismiles.com
6  Attorneys for Green Fuel Technologies, L.L.C.

7  Christopher J. Pattock
   Office of the United States Trustee
8  230 N. First Avenue, Suite 204
   Phoenix, AZ 85003-1706
9  Christopher.J.Pattock@usdoj.gov

10 Patrick A. Clisham, Esq.
   ENGELMAN BERGER, P.C.
11 3636 N. Central Avenue, Suite 700
   Phoenix, AZ  85012
12 pac@eblawyers.com
   Attorneys for Titan Bank, N.A.

/s/ Lisa Remus

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000